# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF WASHINGTON
# SEATTLE DIVISION

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>DRAGONCHAIN, INC., DRAGONCHAIN FOUNDATION, THE DRAGON COMPANY, and JOSEPH J. ROETS,<br><br>Defendants. | Case No.<br><br><br>**COMPLAINT** |

Plaintiff Securities and Exchange Commission (the "SEC"), for its Complaint against Defendants Dragonchain, Inc. ("Dragonchain"), Dragonchain Foundation (the "Foundation"), The Dragon Company ("TDC"), and Joseph J. Roets ("Roets") (collectively, "Defendants"), alleges as follows:

## SUMMARY

1. From at least 2017 through the present, Dragonchain conducted an unregistered offering of a crypto asset called a "Dragon" ("DRGN"), illegally raising over $16 million in

COMPLAINT
*SEC v. DRAGONCHAIN, INC. ET AL.* (NO. _____)

1

Securities and Exchange Commission
175 West Jackson Blvd., Suite 1450
Chicago, Illinois 60604
(312) 353-7390

proceeds through unregistered offers and sales of these securities to approximately 5,000 investors in the United States and abroad. Dragonchain used these proceeds to try to develop a type of blockchain technology – a peer-to-peer database spread across a network of computers – that businesses can incorporate into their daily activities. Dragonchain offered and sold DRGN tokens through channels that included a Dragonchain website, social media, conference appearances, and Telegram.

2. In 2017, Dragonchain minted DRGNs and conducted an offering of 55% of them in two phases: (1) a discounted "presale" in August 2017 to members of a crypto investment club, and (2) an initial coin offering ("ICO") in October and November 2017 marketed predominately to crypto investors. Through this offering, Dragonchain raised approximately $14 million.

3. Then, between 2019 and 2022, Dragonchain raised approximately $2.5 million by offering and selling additional DRGNs, to cover business expenditures and to further develop and market Dragonchain technology.

4. Dragonchain undertook its distribution of DRGNs without registering its offers and sales of DRGNs with the SEC as required by the federal securities laws, and no exemption from this requirement applied.

5. Dragonchain's marketing materials explicitly stated that the value of the token would increase as adoption of its technology grew. Dragonchain told purchasers that the value of DRGNs would rise as the Dragonchain "ecosystem" matured. Dragonchain also stated that it would use proceeds of the offering to develop additional features and market its technology to businesses, thereby promoting adoption of its technology.

6. Dragonchain also made clear to investors that DRGNs would be "listed" on trading platforms. Roets, Dragonchain's founder, personally told investors that he understood that liquidity and the ability to exit an investment quickly was an advantage of being a crypto investor over a traditional investor.

7. Dragonchain retained social media forum moderators and crypto influencers who regularly discussed DRGNs' investment value, trading prices, and market capitalization, and

COMPLAINT
*SEC v. DRAGONCHAIN, INC. ET AL.* (NO. _____)

2

Securities and Exchange Commission
175 West Jackson Blvd., Suite 1450
Chicago, Illinois 60604
(312) 353-7390

Dragonchain's Twitter profile regularly reposted others' investment value-related tweets about DRGNs.

8. DRGN purchasers invested money in the form of cash, Bitcoin or Ethereum in exchange for DRGNs.

9. Because Dragonchain never filed a registration statement for its offer and sale of DRGNs, it never provided investors with the material information that other issuers include in such statements when soliciting public investment. Instead, Dragonchain created an information vacuum such that it could sell DRGNS into a market that possessed only the information Dragonchain chose to share about DRGNs.

10. The Foundation, a non-profit entity that Roets founded and controls, owned the intellectual property associated with the Dragonchain technology. It received a significant portion of the proceeds from the unregistered offer and sale of DRGNs in the 2017 "presale" and ICO and in the additional offers and sales of DRGNs from 2019 through 2022. The Foundation also received a significant portion of the DRGNs that Dragonchain minted but withheld from sale. Additionally, the Foundation's President participated in several public presentations regarding Dragonchain and the offering of DRGNs, and Roets made public appearances and statements regarding Dragonchain and the offering of DRGNs while serving as the Foundation's Chairman. Therefore, the Foundation conducted an illegal offer and sale of DRGNs.

11. TDC, meanwhile, used DRGNs to pay service providers for a variety of services provided to Dragonchain during 2019 through 2022, thereby selling DRGNs through an illegal unregistered offering.

12. Roets, as the founder and primary decisionmaker of Dragonchain, the Foundation, and TDC, was a necessary and substantial participant in these entities' securities law violations, and he personally committed these violations.

## **VIOLATIONS**

13. By engaging in the conduct set forth in this Complaint, Defendants engaged in the unlawful offer and sale of securities in violation of Sections 5(a) and 5(c) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a) and 77e(c).]

COMPLAINT  
*SEC v. DRAGONCHAIN, INC. ET AL.* (NO. _____)

3

Securities and Exchange Commission  
175 West Jackson Blvd., Suite 1450  
Chicago, Illinois 60604  
(312) 353-7390

14. Unless Defendants are permanently restrained and enjoined, they will continue to engage in the acts, practices, and courses of business set forth in this Complaint and in acts, practices, and courses of business of similar type and object.

## NATURE OF THE PROCEEDING AND RELIEF SOUGHT

15. The SEC brings this action pursuant to the authority conferred upon it by Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)].

16. The SEC seeks a final judgment imposing: (a) a permanent injunction enjoining Defendants from violations of Sections 5(a) and 5(c) of the Securities Act; (b) pursuant to Section 21(d)(5) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C § 78u(d)(5)], permanent conduct-based injunctions: (i) against Dragonchain, the Foundation, and TDC, prohibiting each of them from participating, directly or indirectly, in any crypto asset securities offering; and (ii) against Roets, prohibiting him from participating, directly or indirectly, in any crypto asset securities offering; provided, however, that such injunction shall not prevent Roets from purchasing or selling securities, including crypto assets, other than DRGNs for his own personal accounts; (c) disgorgement of each of Defendant's ill-gotten gains resulting from the conduct alleged in the Complaint, plus prejudgment interest thereon; and (d) civil money penalties against Defendants pursuant to Section 20(d) of the Securities Act [15 U.S.C § 77t(d)].

## JURISDICTION AND VENUE

17. This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)].

18. Defendants, directly or indirectly, have made use of the means or instruments of transportation or communication in interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

19. Venue is proper in the Western District of Washington pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)]. Dragonchain, the Foundation, and TDC have offices in this District, Roets resides in this District, and Roets made certain statements at issue in this case while physically present in this District. All Defendants sold or orchestrated sales of DRGNs to purchasers residing in this District.

COMPLAINT
SEC v. DRAGONCHAIN, INC. ET AL. (NO. _____)

4

Securities and Exchange Commission
175 West Jackson Blvd., Suite 1450
Chicago, Illinois 60604
(312) 353-7390

## DEFENDANTS

20. **Dragonchain, Inc.** is a Washington corporation with its principal place of business in Bellevue, Washington. It markets and purports to develop Dragonchain's technology and its "ecosystem."

21. **Dragonchain Foundation** is a non-profit entity organized in Washington, with its principal place of business in Bellevue, Washington. It owns intellectual property rights for the code and technology to be utilized by Dragonchain and TDC.

22. **The Dragon Company** is a Washington corporation with its principal place of business in Bellevue, Washington. It markets and purports to provide adoption services for Dragonchain technology and the Dragonchain "ecosystem."

23. **Joseph John Roets,** age 51, is a resident of Bellevue, Washington. He is a founder and controlling person of Dragonchain, the Foundation, and TDC.

## STATUTORY AND LEGAL FRAMEWORK

24. Congress enacted the Securities Act to regulate the offer and sale of securities. In contrast to ordinary commercial principles of caveat emptor, Congress enacted a regime of full and fair disclosure, requiring a company (an issuer) and its control persons who offer and sell securities to the investing public to provide sufficient, accurate information to allow investors to make informed decisions before they invest.

25. Sections 5(a) and 5(c) of the Securities Act require persons who offer and sell securities to the public to register those offers and sales with the SEC, absent certain exemptions that do not apply to Defendants' transactions. Registration statements relating to an offering of securities provide public investors with material information about the issuer and the offering, including financial and managerial information, how the issuer will use offering proceeds, and the risks and trends that affect the enterprise and an investment in its securities.

26. Section 5 of the Securities Act is all embracing; it prohibits any unregistered securities offering. Through exemption provisions like Section 4 of the Securities Act [15 U.S.C. § 77d], however, Congress distinguished between (1) sales by issuers of their securities into public

COMPLAINT
*SEC v. DRAGONCHAIN, INC. ET AL.* (NO. _____)

5

Securities and Exchange Commission
175 West Jackson Blvd., Suite 1450
Chicago, Illinois 60604
(312) 353-7390

markets, which require registration, and (2) ordinary trading transactions in the market by investors, once the securities have come to rest with them, which typically are exempted from registration.

27. Congress sought to provide the protections afforded by registration both where securities are sold directly to the public by the issuer, and where they are publicly sold through an intermediary who buys the stock from the issuer with a view to public resale, *i.e.*, "underwriters." 15 U.S.C. § 77b(a)(11). Congress enacted a broad definition of underwriter to include all persons who might operate as conduits for securities being placed into the hands of the investing public.

28. An issuer's sales of securities may be exempt from registration provided they are not part of a public offering. Securities distributions, or public offerings, by issuers, with or without the use of underwriters, are not exempt from registration and must be registered under Section 5. Congress structured exemptions and safe harbors from registration to exempt transactions where the purpose and protections of registration have been otherwise satisfied. The party claiming an exemption bears the burden of showing the transaction is entitled to one.

29. After an issuer registers the offer and sale of its securities under the Securities Act, the Exchange Act requires the issuer to make periodic and current public disclosures, including annual, quarterly, and current reports that provide similar disclosure, including a description of the issuer's business, management's discussion and analysis, disclosure of significant events, and financial information. These filings are necessary to achieve the statutory goal of enabling investors in the offering, as well as would-be purchasers in secondary transactions, to make informed decisions.

30. The definition of a "security" under the Securities Act includes a wide range of investment vehicles, including "investment contracts." Investment contracts are instruments through which a person invests money in a common enterprise and reasonably expects profits or returns derived from the entrepreneurial or managerial efforts of others. Courts have found that novel or unique investment vehicles constitute investment contracts, including interests in orange groves, animal breeding programs, railroads, mobile phones, and enterprises that exist only on the Internet. As the United States Supreme Court noted in *SEC v. W.J. Howey Co.*, Congress defined "security" broadly to embody a "flexible rather than a static principle, one that is capable of adaptation to meet

COMPLAINT
*SEC v. DRAGONCHAIN, INC. ET AL.* (NO. _____)

6

Securities and Exchange Commission
175 West Jackson Blvd., Suite 1450
Chicago, Illinois 60604
(312) 353-7390

the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." 328 U.S. 293, 299 (1946).

## BACKGROUND ON CRYPTO ASSETS AND BLOCKCHAINS

31. The term "crypto asset" refers to an asset issued and/or transferred using distributed ledger or blockchain technology, including assets sometimes referred to as "cryptocurrencies," "virtual currencies," digital "coins," and digital "tokens."

32. A blockchain or distributed ledger is a peer-to-peer database spread across a network of computers that records all transactions in theoretically unchangeable, digitally recorded data packages. The system relies on cryptographic techniques for secure recording of transactions.

33. Blockchains typically employ a consensus mechanism to "validate" transactions, which, among other things, aims to achieve agreement on a data value or on the state of the ledger.

34. Digital tokens may be traded on crypto asset trading platforms in exchange for other crypto assets or fiat currency (legal tender issued by a country), at times by being allocated to investors' accounts in the records of the platform (*i.e.*, "off-chain"), without necessarily being transferred from one blockchain address to another (*i.e.*, "on-chain").

35. Some crypto assets may be "native tokens" to a particular blockchain—meaning that they are represented on their own blockchain, though other crypto assets may also be represented on that same blockchain. Native tokens typically serve a number of technical functions on a distributed ledger, such as helping secure the ledger from manipulation or other forms of attacks. Like other crypto assets, native tokens may also be sold and traded for consideration.

36. On July 25, 2017, the SEC issued the *Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO*, advising "those who would use . . . distributed ledger or blockchain-enabled means for capital raising[] to take appropriate steps to ensure compliance with the U.S. federal securities laws," and finding that the offering of crypto assets at issue in that report were investment contracts and, therefore, securities.

## FACTS

### I. The Creation of DRGNs

COMPLAINT
*SEC v. DRAGONCHAIN, INC. ET AL.* (NO. _____)

7

Securities and Exchange Commission
175 West Jackson Blvd., Suite 1450
Chicago, Illinois 60604
(312) 353-7390

37. In October 2016, the Walt Disney Company ("Disney") publicly released as open source certain blockchain software code it had developed internally. According to Disney's release, this code "attempt[ed] to simplify integration of real business application into blockchain."

38. Roets established Dragonchain to try to build on Disney's open-sourced code and create a "turnkey" (meaning, convenient to implement) blockchain software with which businesses could introduce blockchain technology into their daily activities ("Turnkey Platform").

39. Through Dragonchain, Roets sought to also build an "ecosystem" – a community of users, developers, and other service providers interacting with each other and with Turnkey Platform customers through Dragonchain-provided communication portals – which would facilitate and broaden the adoption of the Turnkey Platform by businesses.

40. In order to fund its development and marketing efforts, Dragonchain adopted a business plan that included raising capital through the sale of DRGNs, issued on the Ethereum blockchain, in two phases: (1) a so-called "presale" of DRGNs to a group of crypto analysts and investors at a discounted price, and (2) a public ICO of DRGNs thereafter. Dragonchain publicly stated that it would use the raised funds to hire software developers and marketers and "to deliver our roadmap," meaning its plans to develop the Turnkey Platform and the related ecosystem.

## II. Dragonchain Begins the Offer and Sale of DRGNs

41. Dragonchain conducted its initial "presale" of DRGNs on or about August 22, 2017, raising approximately $1.4 million in Bitcoin and Ethereum from 68 members of a crypto investment club, in which Roets also participated in non-leadership capacity. The DRGNs sold during this phase of the offering constituted approximately 13% of all DRGNs sold by Dragonchain in the offering. The crypto investment club's members interacted primarily online, and the club's activities focused primarily on obtaining profits for its members through speculation in various crypto assets, including ICOs.

42. Among other things, members of the club sometimes obtained early and discounted access to pre-ICO coins with the hopes to resell the coins at a profit during and after the ICO. "Presale" DRGN purchasers paid a price discounted 10% to 30% from the ICO price, with larger discounts for larger DRGN purchases. While soliciting and selling to the "presale" investors,

COMPLAINT
SEC v. DRAGONCHAIN, INC. ET AL. (NO. _____)

8

Securities and Exchange Commission
175 West Jackson Blvd., Suite 1450
Chicago, Illinois 60604
(312) 353-7390

Dragonchain was also soliciting the public for its ICO, which would officially begin on October 2, 2017.

43. Between October 2 and November 2, 2017, Dragonchain offered and sold DRGNs to the public as part of the ICO, raising approximately $12.3 million in Bitcoin, Ethereum, and U.S. Dollars from approximately 5,000 investors worldwide. Dragonchain used the funds raised in the "presale" and the ICO to develop its technology, market its services to businesses, and otherwise pay business expenditures.

44. During the "presale" and ICO, Dragonchain told investors, among other things, that the value of DRGN would grow as the "Dragonchain ecosystem mature[d]." To further entice investors, Dragonchain retained a market maker for DRGNs and targeted its promotional efforts almost entirely on crypto investors.

45. During all relevant times, Roets controlled Dragonchain and the Foundation, executed agreements with service providers, directed Dragonchain personnel, and made critical decisions about, among other things, when and how the offering would be conducted, how DRGNs would be marketed, whether the tokens would be issued on the Ethereum or native blockchain, how many tokens would be issued, at what price they would be offered and sold, and whether to cap the total number of tokens that could ever be issued. During the offering and in the run-up to it, Roets was the primary decision-maker regarding the structure and marketing of the offering. Roets also personally solicited members of the investment club during the "presale" phase and personally solicited the public for the ICO during his many public appearances, public statements, and videos discussing the ICO.

**III. Dragonchain Engages in Numerous Efforts to Attract More Investors to DRGNs**

46. Prior to and during the 2017 "presale" and ICO, Dragonchain advertised DRGNs as "utility" tokens, claiming that businesses would use DRGNs, rather than fiat currency or other crypto assets, to pay for the various features and uses of the Turnkey Platform. However, at the time of the "presale" and the ICO, Dragonchain did not require DRGNs to be used as a medium of exchange. In addition, Dragonchain did not require potential Turnkey Platform customers to purchase DRGNs in the offering. It publicly stated that Turnkey Platform customers would be able

COMPLAINT
*SEC v. DRAGONCHAIN, INC. ET AL.* (NO. _____)

9

Securities and Exchange Commission
175 West Jackson Blvd., Suite 1450
Chicago, Illinois 60604
(312) 353-7390

1   to purchase DRGNs directly from Dragonchain on an as-necessary basis, effectively allowing fiat
2   currency as a medium of exchange for the use of the Turnkey Platform.

3       47.    Dragonchain did not direct its marketing of DRGNs to businesses who were
4   interested in using its Turnkey Platform. Instead, Dragonchain's marketing efforts focused on the
5   crypto investor community. Specifically, during the ICO, Dragonchain paid sales-based
6   commissions to dozens of "crypto influencers" – persons with regular communication channels
7   through which they provide their opinions and analysis to previously established audiences of
8   crypto investors and enthusiasts – to promote DRGNs to the public as part of its "referral"
9   campaign.

10       48.    Most of these crypto influencers were "presale" purchasers, who received DRGNs at
11   a discount, and therefore had additional interest in attracting more buyers to the ICO: because
12   Dragonchain capped the total supply of DRGNs available for the ICO, additional purchases during
13   the ICO necessarily increased the price of the token, and therefore the profit at which the "presale"
14   purchasers could sell their discounted tokens.

15       49.    The crypto influencers and Dragonchain's public forum moderators made numerous
16   statements in social media regarding the benefits of an investment in DRGNs, the increases in
17   DRGNs' price they expected in the future, and the "listing" of DRGNs on crypto asset trading
18   platforms. Dragonchain referred potential purchasers to a social media channel explicitly dedicated
19   to investment-related and price-speculation discussions about DRGNs. Dragonchain's staff also
20   reposted on Dragonchain's social media accounts statements by others about DRGNs' investment
21   value, pricing, and market capitalization.

22       50.    During the ICO, Dragonchain's website stated that Dragonchain expected the value
23   of DRGNs to increase as the "ecosystem matures." Public discussions among potential and actual
24   DRGN purchasers on social media included frequent references to pricing and investment value of
25   DRGNs. Roets and other Dragonchain and Foundation personnel talked about prospects for
26   development of the Turnkey Platform and the ecosystem on blogs, social media, online videos, and
27   online forums.  Dragonchain's marketing efforts, overseen by Roets, included targeting social
28   media and other websites frequently visited by cryptocurrency investors, such as BitcoinTalk.org,

COMPLAINT
SEC v. DRAGONCHAIN, INC. ET AL. (NO. _____)

10

Securities and Exchange Commission
175 West Jackson Blvd., Suite 1450
Chicago, Illinois 60604
(312) 353-7390

InvestInIt.com, 21.co, and over a dozen of ICO tracker sites expressly aimed at crypto asset investors. In promoting their initial coin offering, Roets and other Dragonchain and Foundation executives also participated in interviews with individuals focused on crypto asset investing.

51. Further, Dragonchain sought to make DRGNs more attractive to investors in other ways. Dragonchain knew that investors wanted the ability to freely trade DRGNs in the secondary market. Roets made public statements regarding the advantage crypto asset investors have over traditional investors because the former are able to exit their investments quickly due to the liquidity provided by the secondary markets. Leading up to and during most of the ICO, Dragonchain made clear to prospective investors that it planned for DRGNs to be "listed" on secondary token trading platforms.

52. Until October 30, 2017, Dragonchain's "roadmap," which was prominently posted on its website, included "exchange listing." Dragonchain issued DRGNs using the ERC20 protocol, which is designed to enable tokens to be easily traded on secondary trading platforms. Roets publicly acknowledged that the ERC20 protocol was used to, among other things, "allow easier exchange listing."

53. After the ICO, Dragonchain took steps to get DRGNs "listed" on trading platforms in 2019 and 2020.

54. In addition, Dragonchain-paid "influencers" and advisors publicly discussed "listing" on trading platforms and encouraged greater numbers of DRGN holders to contact trading platforms in order to incentivize the trading platforms to "list" DRGNs.

55. Indeed, after the ICO, Dragonchain personnel, including Roets, solicited two trading platforms to "list" DRGNs by contacting trading platform personnel and providing information regarding Dragonchain and its tokens in order to facilitate "listing." Both trading platforms decided to "list" DRGNs.

56. Dragonchain also capped the number of DRGNs that could ever be created. This ensured that the market value of DRGNs, which was important to investors, would not be diluted in the future by introduction of newly-minted DRGNs into the market.

COMPLAINT
*SEC v. DRAGONCHAIN, INC. ET AL.* (NO. _____)

11

Securities and Exchange Commission
175 West Jackson Blvd., Suite 1450
Chicago, Illinois 60604
(312) 353-7390

57. Given Dragonchain's marketing of the "presale" and ICO to investors, a significant number of purchasers were primarily interested in speculative profits from holding DRGNs, as exhibited by recurrent price- and profit-related discussions on Dragonchain Telegram channels and the fact that one year after the ICO, approximately 56% of all DRGNs purchased during the ICO were transferred, likely sold in the open market to other investors.

58. Dragonchain led investors in DRGNs to reasonably expect that Dragonchain and its agents would undertake significant efforts to increase the price of DRGNs. A reasonable investor in DRGNs accordingly had the understanding that Dragonchain had the economic incentive and capacity to undertake efforts to promote DRGNs, which would serve Dragonchain's economic interest and that of all DRGN owners equally.

59. Dragonchain also led investors to reasonably expect that they could reap a profit from their investment into DRGNs, derived from Dragonchain's and its agents' efforts into their common enterprise. Dragonchain did so by, among other things, stating that Dragonchain's efforts were aimed at increasing demand for DRGNs; assuring investors that Dragonchain would take steps to protect the market for DRGNs, including by fostering a readily available trading market in DRGNs; and highlighting DRGN price increases and at times tying them to Dragonchain's efforts.

60. Dragonchain possessed sole discretion to decide how proceeds from the sale of DRGNs have been or will be spent.

61. Investors who purchased DRGNs invested into a common enterprise with other DRGN purchasers, as well as with Dragonchain.

62. Because DRGNs are fungible, the fortunes of DRGN purchasers were and are tied to one another, and each depend on the success of Dragonchain's strategy. In other words, Dragonchain's success or failure in propelling trading of DRGNs drives demand for DRGNs, which will dictate investors' profits (recognized in increased prices at which they could sell DRGNs) or losses.

63. DRGN investors stand to profit equally if the popularity and price of DRGNs increase, and no investor will be entitled to a higher proportion of price increases. In other words, the price of DRGNs rises and falls for DRGN investors together and equally for all investors.

COMPLAINT
SEC v. DRAGONCHAIN, INC. ET AL. (NO. _____)

12

Securities and Exchange Commission
175 West Jackson Blvd., Suite 1450
Chicago, Illinois 60604
(312) 353-7390

64. Moreover, Dragonchain pooled the funds it raised and used them to fund its operations. The nature of DRGNs themselves made them the common thread among Dragonchain, its management, and all other holders of DRGNs.

65. Dragonchain's statements and actions and the economic reality of Dragonchain's relationship to DRGNs and of Dragonchain's payments to third parties to help it achieve trading of DRGNs.

66. The very nature of DRGNs in the market—as constructed and promoted by Dragonchain—compels reasonable DRGN purchasers to view DRGNs as an investment.

67. DRGNs are freely transferable or tradeable without restrictions the moment they are purchased, and DRGNs were offered broadly and widely to all potential purchasers, not just those who might be reasonably expected to "use" DRGNs.

## IV. Dragonchain Sells or Transfers More DRGNs to Pay Contractors and Service Providers

68. After the "presale" and ICO, Dragonchain retained approximately 45% of all DRGNs it minted. Roets formed TDC in 2019 and used TDC to pay DRGNs owned or controlled by Dragonchain and the Foundation to contractors and service providers for a variety of services provided to Dragonchain. Although TDC was nominally the counterparty on most of the agreements memorializing these business relationships, Dragonchain and third party personnel referred to TDC and Dragonchain interchangeably. Moreover, though TDC, and not Dragonchain or the Foundation, was a party to most of the relevant agreements, the DRGNs that were sold or transferred thereby all came from crypto wallets controlled by Dragonchain and the Foundation.

69. Between 2019 and 2022, Dragonchain sold or transferred approximately $2.5 million worth of these DRGNs in order to fund Dragonchain's operations, including marketing, customer support, development, and advisory services, as well as an investment in another blockchain company. Approximately $544,000 of that amount was sold directly in the open market, while the remainder was transferred to contractors and service providers, who thereafter sold most of the DRGNs in the open market.

COMPLAINT
SEC v. DRAGONCHAIN, INC. ET AL. (NO. _____)

13

Securities and Exchange Commission
175 West Jackson Blvd., Suite 1450
Chicago, Illinois 60604
(312) 353-7390

70. More specifically, in 2019, Dragonchain sold 20 million DRGNs on the open market in order to purchase $499,999 worth of shares of CoinMe Inc., another blockchain company.

71. Then, in 2020, TDC paid approximately 28 million DRGNs, worth approximately $1.3 million, to Dragonchain's marketing and advertising services provider. Because TDC placed no resale restrictions on these DRGNs, they quickly flowed into the open market for purchase by retail investors. The service provider resold the DRGNs on the open market shortly after receiving them.

72. Also in 2020, Dragonchain paid another blockchain company $259,000 worth of DRGNs for advisory and other services pursuant to a 2017 agreement. Because these DRGNS were not identified in any way as restricted, the recipient immediately resold all the DRGNs in the open market. From 2020 forward, TDC paid six independent contractors approximately $378,000 for marketing, sales, systems support, software development, and management services. As with the other transactions, five of six contractors resold on the open market all or a majority of the DRGNs they received as compensation, sometimes shortly after receiving DRGNs from Dragonchain.

73. In 2020 and 2021, TDC enlisted the services of a crypto asset market maker to sell $45,755 worth of DRGNs on the open market in order to cover, among other things, payments to Dragonchain's software development personnel. Some of the above transactions took place after Dragonchain entered into a January 2021 consent order with the Washington state's Department of Financial Institutions, which found that DRGNs were securities.

## V. Dragonchain Fails To Register the Offer and Sale of DRGNs with the SEC

74. Dragonchain used interstate commerce for the offer and sale of DRGNs by, among other things, promoting investments in DRGNs in emails, internet messaging platforms, interviews disseminated to the public through television and the Internet, and publicly available social media applications; and by effecting transfers of DRGNs through global crypto asset trading platforms.

75. Dragonchain never filed a registration statement with the SEC with respect to any DRGNs they it offered or sold or intends to offer or sell, and no registration statement has ever been in effect with respect to any offers or sales of DRGNs.

76. Dragonchain's public disclosures contained selective or no information about

COMPLAINT
*SEC v. DRAGONCHAIN, INC. ET AL.* (NO. _____)

14

Securities and Exchange Commission
175 West Jackson Blvd., Suite 1450
Chicago, Illinois 60604
(312) 353-7390

Dragonchain's financial history, audited financial statements, management discussion and analysis of its financial condition and results of operations, and ability to generate profits. Purchasers who bought or received DRGNs have not received any documents containing information about Dragonchain's operations, financial condition, or other factors relevant in considering whether to invest in DRGNs. DRGN investors have also been deprived of information about how DRGN's executives are being compensated as a result of the offer and sale of DRGNs. Nor have investors received complete information about any steps Dragonchain is taking to affect the trading price of DRGNs. In short, DRGN purchasers and the market lack information that issuers provide for registered offers and sales of securities when they solicit public investment and foster a secondary market in their publicly traded securities.

## CLAIM FOR RELIEF

### Violations of Sections 5(a) and 5(c) of the Securities Act

### (All Defendants)

77. The SEC realleges and incorporates by reference the allegations in paragraphs __ through 76 above.

78. By virtue of the foregoing: (a) without a registration statement in effect, Defendants, directly and indirectly, made use of the means and instruments of transportation or communications in interstate commerce or of the mails to sell securities through the use or medium of any prospectus or otherwise, and (b) without a registration statement in effect, Defendants, directly and indirectly, made use of the means and instruments of transportation or communication in interstate commerce or of the mails to offer to sell through the use or medium of a prospectus or otherwise, securities as to which no registration statement had been filed; all in violation of Securities Act Sections 5(a) and 5(c) [15 U.S.C. §§ 77e(a), (c)].

79. By reason of the conduct described above, Defendants, directly or indirectly, violated, are violating, and, unless enjoined, will continue to violate Securities Act Sections 5(a) and 5(c) [15 U.S.C. §§ 77e(a), (c)].

## PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that the Court enter a Final Judgment:

COMPLAINT
*SEC v. DRAGONCHAIN, INC. ET AL.* (NO. _____)

15

Securities and Exchange Commission
175 West Jackson Blvd., Suite 1450
Chicago, Illinois 60604
(312) 353-7390

### I.

Permanently enjoining Defendants, and each of their respective agents, servants, employees, attorneys and other persons in active concert or participation with any of them, from violating, directly or indirectly, Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. § 77e(a), 77e(c)].

### II.

Pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C § 78u(d)(5)], permanently enjoining each of Dragonchain, the Foundation, and TDC from participating, directly or indirectly, in any crypto asset securities offering; and permanently enjoining Roets from participating, directly or indirectly, in any crypto asset securities offering; provided, however, that such injunction shall not prevent Roets from purchasing or selling securities, including crypto assets, other than DRGNs for his own personal accounts.

### III.

Ordering Defendants to disgorge all ill-gotten gains resulting from the conduct alleged in the Complaint, with prejudgment interest thereon.

### IV.

Ordering Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C § 77t(d)]; and

### V.

Granting any other and further relief this Court may deem just and proper for the benefit of investors.

### **JURY DEMAND**

The SEC demands a trial by jury.

COMPLAINT
*SEC v. DRAGONCHAIN, INC. ET AL.* (NO. _____)

16

Securities and Exchange Commission
175 West Jackson Blvd., Suite 1450
Chicago, Illinois 60604
(312) 353-7390

Dated:  August 16, 2022              Respectfully submitted,

/s/ Eric M. Phillips
Eric M. Phillips (conditionally admitted pursuant to LCR 83.1(c) (2)
Arsen R. Ablaev (conditionally admitted pursuant to LCR 83.1(c) (2)
175 West Jackson Boulevard, Suite 1450
Chicago, IL  60604-2615
Phone:  (312) 353-7390
Facsimile: (312) 353-7398
Email: phillipse@sec.gov (Phillips)
Email: ablaeva@sec.gov (Ablaev)

*Attorneys for Plaintiff*
*U.S. Securities and Exchange Commission*

COMPLAINT
*SEC v. DRAGONCHAIN, INC. ET AL*. (NO. _____)

17

Securities and Exchange Commission
175 West Jackson Blvd., Suite 1450
Chicago, Illinois 60604
(312) 353-7390